# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| SHEKITA T. MAXWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 5:16-CV-572 (MTT) |
| ) | |
| MEGAN J. BRENNAN, *Postmaster* ) | |
| *General of the U.S. Postal Service*, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## ORDER

Defendant Megan J. Brennan, Postmaster General of the U.S. Postal Service, has moved for summary judgment. Doc. 17. The motion is **GRANTED.**

## I. BACKGROUND

On December 27, 2016, Plaintiff Shekita T. Maxwell, proceeding pro se, filed this complaint against Defendant Megan J. Brennan, in her capacity as Postmaster General of the U.S. Postal Service, alleging Maxwell suffered discrimination, disparate treatment, and a hostile work environment based on both her race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*[1] *See generally* Doc. 1. The Postal Service moved for summary judgment on December 13, 2017. Doc. 17.

---

[1] In her complaint, Maxwell alleges she suffered harassment in violation of the ADA and ADEA, and, in her response to the Postal Service's summary judgment motion, she claims she was discriminated against because of disability. Docs. 1 at 2; 22 at 11, 16. But Maxwell has never alleged that she was disabled although she had been placed on restrictions due to her pregnancy; thus, the Court assumes this refers to Maxwell's claim that she was discriminated against because of her pregnancy, which, according to her own testimony, is subsumed into her gender discrimination claim. Doc. 19 at 31:18-23. In her response to the Postal Service's summary judgment motion, Maxwell also cites to 42 U.S.C. § 1981, however, it does not appear that she intended to bring a § 1981 claim but only a Title VII claim. Doc. 22 at 10-11. Regardless, even if she did intend to bring a § 1981 claim based on the same allegations of disparate treatment and hostile work environment as her Title VII claim, "[b]oth of these statutes have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Courts may "explicitly address [a plaintiff's] Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." *Id.* Therefore, because the Postal Service is entitled to summary

## II. SUMMARY JUDGMENT

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A material fact is any fact relevant or necessary to the outcome of the suit. *Id.* at 248. And a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Id.* (citation omitted). Accordingly, "the mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1243 (11th Cir. 2001) (citation and punctuation marks omitted).

The party moving for summary judgment bears the burden to show that there is no issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may make this showing by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

---

judgment regarding Maxwell's Title VII claim, it is also entitled to summary judgment as to any § 1981 claim, to the extent Maxwell brings such a claim. Finally, Maxwell also cites 42 U.S.C. § 1985 and alleges her coworkers "did conspire" to discriminate against her, "thus violating the Civil Rights Act of 1964." This appears to be an allegation regarding her Title VII claim and not an attempt to allege a conspiracy claim. But to the extent Maxwell does attempt to allege a conspiracy, § 1985(3), which relates to depriving persons of rights or privileges, "may not be invoked to redress violations of Title VII" and requires proof of conspiracy and group animus. *Great Am. Fed. Sav. & Loan Ass'n v. Notvotny*, 442 U.S. 366, 378 (1979), *superseded by statute on other grounds as recognized by Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 191-92 (7th Cir. 1994). Construed in her favor, Maxwell alleges group animus but provides no evidence of a conspiracy among the various actors whom she alleges discriminated against her. And thus, to the extent she alleges such a claim, it too fails.

interrogatory answers, or other materials," or by showing that the non-movant cannot produce admissible evidence to support the issue of material fact. Fed. R. Civ. P. 56(c)(1). If the movant meets this burden, the non-moving party must produce evidence showing that an issue of material fact does exist. *Celotex Corp.*, 477 U.S. at 324. To do so, the non-moving party must "go beyond the pleadings" and identify "specific facts showing a genuine issue for trial." *Id.*; *see also* Fed. R. Civ. P. 56(e)(2)-(3). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255 (citation omitted).

## A.  Facts[2]

Drawing all inferences in favor of Maxwell where possible, the facts of this case are as follows. On April 4, 2015, Maxwell, an African-American female, began working with the United States Postal Service as a postal support employee (PSE) sales, services, and

---

[2] Unless otherwise stated, all facts are undisputed. Cognizant of Maxwell's pro se status, following Brennan's motion for summary judgment, the Court advised Maxwell of her duty to respond to a motion for summary judgment, including that she could not rely on the pleadings but instead must present evidence to establish a genuine issue of material fact, and must provide her own statement of material facts and respond to Brennan's. Doc. 20. Despite this notice, Maxwell's response, which was filed late, failed to meet these requirements. *See* Doc. 22. Not only did Maxwell not respond to Brennan's asserted facts, but she failed to provide her own statement of material facts. *Id*. Rather, Maxwell re-stated conclusory arguments from her complaint. *Id*. And Maxwell presented no evidence, besides her own allegations, to support her claims. *See id*. Thus, Maxwell has "fail[ed] to properly support an assertion of fact [and] fail[ed] to properly address [Brennan]'s assertion of fact as required by [Fed. R. Civ. P.] 56(c)," and, accordingly, "the court may . . . consider [those] facts undisputed for purposes of the motion" pursuant to Rule 56(e)(2). Moreover, pursuant to Local Rule 56, those material facts asserted by Brennan, "which [Maxwell has] not specifically controverted by specific citation to particular parts of materials in the record," are deemed to be admitted. M.D. Ga. L.R. 56 ("All material facts contained in the movant's statement [of material facts] which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate."). However, as required, the Court has still "review[ed] the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008) (citation and quotation marks omitted). And despite the deficiencies in Maxwell's response, because Maxwell is proceeding pro se, and because summary judgment would lead to dismissal of her claims with prejudice, the Court has undergone a full analysis of Maxwell's claims for relief regardless of these failings and insufficiencies in her response. *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." (citation omitted)). Therefore, if evidence in the record shows that a fact is disputed, the Court draws all justifiable inferences in Maxwell's favor for purposes of summary judgment.

distribution associate. Doc. 9 at 51, 355. Maxwell's employment was only temporary with her appointment scheduled to end on March 28, 2016. *Id.* Moreover, her employment included a three-month probationary period, which, for Maxwell, would have ended on July 3, 2016. *Id.* However, her temporary employment proved to be much shorter, and more tumultuous, than expected, lasting only until May 7, 2015. *Id.* at 348.

Maxwell first worked at her assigned worksite location, the Zebulon Road Post Office in Macon, Georgia, on April 8, 2015 after completing orientation. Docs. 9 at 364; 19 at 15:3-16. Soon after this, Maxwell started having issues with two of her coworkers, Bonnie Hester and Jacqueline Epps, both of whom were white. Docs. 9 at 227-231; 19 at 32:6-14. Epps and Hester, who, according to Maxwell, had a history of treating other African-American employees poorly, allegedly harassed Maxwell by "fussing" at her, "arguing" with her, "jumping in [her] face," and saying discriminatory comments, including Hester telling Maxwell she did not like "her kind," meaning African-Americans, and Epps telling Maxwell that "White people run this!" Docs. 1 at 11; 19 at 32:9-11, 34:21-35:2, 51:24-53:5. The relationship between Maxwell and her coworkers continued to sour, and Maxwell complained about the harassment to her supervisor, Marcus Daniels. Docs. 1 at 4; 19 at 95:10-16. Maxwell claims that Daniels, who is also African American, told her he "did not like black females" and that he would not side with her against Hester because people would think he favored African-American employees. Docs. 1 at 4; 9 at 38; 19 at 95:4-7, 95:10-16. In addition to her issues with coworkers, two weeks into her nearly one-month employment with the Postal Service, Maxwell learned she was pregnant. Docs. 9 at 100; 19 at 88:15-18. And, after notifying the Postal Service of this, she was placed on work restrictions, although Maxwell claims those restrictions were not sufficient. Doc. 19 at 89:8-25.

On April 23, 2015, 15 days after Maxwell began working at the Zebulon Road facility, Maxwell and Hester had a disagreement related to mail sorting activities, and, in response, management met with the two, along with a union representative, to resolve the dispute in accordance with the Postal Service's standard operating procedures. Doc. 17-2 ¶¶ 9-10. The issue was resolved, but then, on April 25, Maxwell and Epps engaged in a heated altercation because Maxwell was upset that Hester moved a work-related item in Maxwell's workspace; co-workers had to physically separate Maxwell and Epps as a result. Docs. 9 at 227-231, 347; 17-2 ¶¶ 3, 12, 14. Once separated, Maxwell, Hester, and Epps were brought into a conference room to discuss the incident with two supervisors and a union representative. Doc. 17-2 ¶¶ 15-16. After Epps entered the room, she made a "gesture" toward Maxwell who then "assumed a 'defensive yet aggressive posture.'" *Id*. ¶ 16 (quoting Doc. 9 at 227-231). Daniels then sent all three women home for the day. Docs. 9 at 245; 17-2 ¶ 17. After this altercation, Maxwell was placed on emergency leave. Doc. 9 at 227-231, 347. Management then requested that the U.S. Postal Inspection Service and the Employee Assistance Program send a Threat Assessment Team to investigate the situation. Doc. 17-2 ¶ 18.

After an investigation and review of the facts, Hester was given a warning letter, and Epps was suspended for 14 days. Docs. 9 at 245; 17-2 ¶ 19. But Daniels determined that, because Maxwell had been "extremely aggressive" towards Daniels and others, it was appropriate to terminate Maxwell's probationary employment; thus, Maxwell was fired for failing to "maintain harmonious working relationships" and for "contribut[ing] to an unpleasant working environment." Doc. 9 at 347-48. She received a Notice of Termination During Probation on May 7, 2015. Docs. 9 at 348; 17-2 ¶ 21. After her termination, Maxwell unsuccessfully pursued several administrative remedies against her

former employer. *See* Docs. 1 at 10; 17-2 ¶ 5; *see generally* Doc. 9. Maxwell then filed this action, stating claims under Title VII, specifically that she suffered discrimination, disparate treatment, and a hostile work environment.

**B.    Discrimination and Disparate Treatment Claim**

Maxwell alleges that she suffered discrimination and disparate treatment based on both her gender and her race in violation of Title VII. To survive summary judgment on either claim, she may rely on "direct evidence, circumstantial evidence, or [ ] statistical proof." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). When a plaintiff relies on circumstantial evidence, the court determines the sufficiency of her claim through the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Accordingly, the Court must first determine whether Maxwell presents direct evidence of race or gender-based discrimination.

**1.  Direct Evidence**

Direct Evidence is that which, "if believed, proves [the] existence of [a] fact in issue without interference or presumption." *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997). Direct evidence of employment discrimination shows, without inference, that a decision-maker was motivated by illegal reasons, like racial animus, in doling out an adverse employment decision. *Quigg v. Thomas County School Dist.*, 814 F.3d 1227, 1236 n.5 (11th Cir. 2016); *Williamson v. Adventist Health Sys/Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010) (citations omitted); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004). Remarks that are isolated and "unrelated to the challenged employment decision" do not constitute direct evidence of discrimination. *Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002). And "[i]f an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial

evidence." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999). Thus, direct evidence is limited to "[o]nly the most blatant remarks" that can only be interpreted to show the decision-maker was motivated to "discriminate on the basis of some impermissible factor." *See Quigg*, 814 F.3d 1227, 1242 n.11 (alterations in original) (quoting *Wilson*, 376 F.3d at 1086) (explaining that a school board member's statement that "it is time we put a man in there" was not direct evidence that a female superintendent was fired for illegal reasons because the statement could be interpreted not to refer to that employment decision and, even so, an inference was still required to reach that conclusion); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("We have held that statements that are open to more than one interpretation do not constitute direct evidence of racial discrimination.").

There is no direct evidence that Maxwell was discriminated against because of her gender and pregnancy. Doc. 19 at 31:19-23. But, construing her allegations liberally, Maxwell alleges that two statements by her former supervisor, Marcus Daniels, are direct evidence that her employment was terminated for discriminatory reasons.[3] First, Maxwell alleges that Daniels, in explaining why he would not punish Hester in response to Maxwell's complaints, told her, "They (Tim Goodwin[, the local Postmaster at the time] and other white employees) will say Cent (Cynthia Tufts-Supervisor Zebulon Station) and I are playing the race card if we take your side." Doc. 9 at 38. Maxwell does not say when Daniels made this comment, but she does not contend it was made in connection with her termination. Thus, there is no evidence that Daniels's comment relates directly to

---

[3] As will be discussed in more detail, Maxwell alleges discriminatory statements by her co-workers, Epps and Hester, but those individuals were not Maxwell's superiors and did not have decision-making authority over her. Thus, those statements do not "indicate that the complained-of employment decision was motivated by the *decision-maker's* [racial animus]." *Williamson*, 372 F. App'x at 940 (citation and quotation marks omitted).

Daniels's decision-making in terminating Maxwell's employment.  See Doc. 1 at 4; Doc. 19 at 95:12-1.  See *Jones v. BE&K Eng'g Co.*, 146 F. App'x 356, 358–59 (11th Cir. 2005) ("In order to constitute direct evidence, the evidence must directly relate in time and subject to the adverse employment action at issue.").  Rather, it is an explanation of why Daniels did not take an employment action against another employee at another time.  See Doc. 1 at 4; Doc. 19 at 95:12-1.  So, to be probative regarding whether Daniels was influenced by an improper motive when he fired Maxwell, a jury would have to infer from this statement that (1) Daniels held an overall reluctance to side with African-American employees when in a dispute with white employees and (2) that this reluctance influenced his decision-making when he fired Maxwell.  Therefore, by definition, the evidence could only be circumstantial because, at most, it merely "*suggests* discrimination, leaving the trier of fact to infer discrimination based on the evidence." *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990) (emphasis in original).

The need for inference to link Daniels's comment to Maxwell's termination is even greater given the two events that transpired the last three days Maxwell worked.  The April 23 and 25 incidents, which nearly came to physical violence, led to the involvement of other management personnel, union officials, and a Threat Assessment Team from the U.S. Postal Inspection Service that investigated those incidents.  Doc. 17-2 at ¶¶ 9-10, 12, 14-16, 18.  Thus, these intervening events and involvement of other Postal Service officials further show Daniels's statement to be isolated and unrelated to Maxwell's termination.  See *Rojas*, 285 F.3d at 1342-43.[4]

---

[4] The involvement of these other individuals could also support the conclusion that Daniels fired Maxwell out of a desire to appear racially unbiased to these individuals.  But again, this requires an inference that Daniels's decision-making in the termination was influenced by the involvement of these individuals and, thus, his desire to appear unbiased.

Additionally, Maxwell alleges that Daniels told her: "I do not like Black Women that is why I married a Mexican. She knows when to be quiet." Doc. 1 at 4; *see also* Doc. 19 at 95:4-7. This statement suggests—or even establishes—a bias on Daniels's part, but an inferential step is still required to move from that bias to the conclusion that any adverse employment action was carried out as a result. Like Daniels's other statement, there is no evidence that this statement was made in connection with Maxwell's termination or the termination process. *See* Doc. 1 at 4; Doc. 19 at 95:4-7. Thus, a jury would have to infer from this statement that Maxwell's termination was a result of Daniels's bias towards black women, and, accordingly, the Court finds Maxwell has presented no direct evidence of discrimination.

### 2. *McDonnell Douglas* Framework[5]

The dearth of direct evidence is not fatal, to Maxwell's case, however, because she also attempts to present circumstantial evidence of discrimination and disparate treatment. Specifically, she alleges that her white coworkers were not disciplined in the same manner that she was for similar conduct. Thus, her claim must be evaluated under the *McDonnel Douglas* framework.[6]

---

[5] The Court recognizes that establishing the *McDonnell Douglas* elements is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff can always avoid summary judgment by creating a triable issue concerning the employer's discriminatory intent. A plaintiff can do this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). However, for reasons discussed throughout this order, Maxwell has not presented "a convincing mosaic of circumstantial evidence" that Brennan acted with discriminatory intent.

[6] From the record, including Maxwell's complaint, her deposition, and response to the motion for summary judgment, it appears that she asserts her claim under a single-motive theory—that the "true reason" behind her employer's adverse employment action was her race. *Quigg*, 814 F.3d at 1235. Accordingly, as opposed to mixed-motive claims, the Court analyzes her circumstantial evidence-based claim under the *McDonnell Douglas* framework. *Id.* at 1237-39. But the Court notes that Maxwell could not survive summary judgment under a mixed-motive theory of liability either because she has not "presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her gender or race] was a motivating factor for [an] adverse employment decision." *Id.* at 1239-40.

Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, the test for which differs slightly depending on the nature of the claim. If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). A plaintiff then has the opportunity to show that the employer's stated reason is in fact pretext for discrimination. *Id.*

### 3. Race-Based Discrimination and Disparate Treatment

#### a. Prima Facie Case

Maxwell has not met her initial burden to establish a prima facie case for either race discrimination or disparate treatment. To recover under either theory, Maxwell must establish that she was treated differently than similarly situated individuals outside of her protected class.[7] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Therefore, she must establish a comparator that is similarly situated "in all relevant respects." *Id.* (citations omitted). Maxwell's claims are based on the fact that she was treated differently than two of her white co-workers—Epps, who was the other participant in the April 25 altercation and was not terminated, and Hester, who, according to Maxwell, was not punished for harassing Maxwell. But the undisputed evidence shows Maxwell, Epps, and Hester were not similarly situated "in all relevant aspects." *See id.*

When she was fired, Maxwell's employment was less than a month into a temporary employment, scheduled to end on March 28, 2016, while both Hester and Epps were

---

[7] The Defendant does not contest the other elements of the prima facie case for race discrimination or disparate treatment.

-10-

permanent employees.  Docs. 9 at 51, 227-31, 355, 383; 19 at 47:2-25.  Moreover, Maxwell was still in the probationary period of her employment at the time of the incidents precipitating her termination.  *Id.* at 355.  On the other hand, Hester was a PSE clerk with "six or seven years" experience whose job duties included training other PSE's; indeed, she trained Maxwell.  Doc. 19 at 47:2-25.  And Epps had a wholly different job than Maxwell—she was a mail carrier with 27 years of experience who was close to retirement.  *Id.* at 48:16-49:3 (Maxwell:  "[T]he mail carriers, they – you know, their job's different from ours."); Doc. 9 at 227-31, 383.  Thus, Maxwell was not similarly situated with Hester or Epps because they had "different experiences, credentials, job duties, and qualifications."[8] *Felder v. Bradford Health Servs.*, 493 F. App'x 17, 20 (11th Cir. 2012); *see also Foster v. Biolife Plasma Servs., LP*, 566 F. App'x 808, 812 (11th Cir. 2014) (holding a comparator was not similarly situated because he worked in a different department and held different job duties than the plaintiff).

Therefore, because Maxwell is not similarly situated with her proffered comparators, there is no material issue as to whether she suffered illegal discrimination, and the Postal Service has established it is entitled to judgment as a matter of law.  *See Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) ("If two employees are not

---

[8] In addition, to establish a proper comparator, the "comparator's misconduct must be 'nearly identical' to prevent judges from second-guessing employers' reasonable decisions.  *Burke–Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir.2006) (per curiam) (citing Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir.1999)); *see also Archie v. Frank Cockrell Body Shop, Inc.*, 581 F. App'x 795, 798 n.1 (11th Cir. 2014) ("Although the nearly identical misconduct requirement was called into question by *Alexander v. Fulton Cty.,* 207 F.3d 1303, 1333–34 (11th Cir.2000), *overruled in part on other grounds by Manders v. Lee,* 338 F.3d 1304, 1328 n. 52 (11th Cir.2003) (en banc), we are bound to follow *Maniccia* 's nearly identical standard rather than the standard articulated in *Alexander* because when a later panel decision contradicts an earlier one, the earlier panel decision controls." (citations and quotation marks omitted)).  Here, Epps was the other party in the altercation that led to Maxwell's termination.  And although there is no allegation that Hester was involved in a physical altercation like Maxwell, construed liberally, Hester's alleged harassment is akin to the behavior that resulted in Maxwell's termination because it also served as a failure to "maintain harmonious working relationships" and "contributed to an unpleasant working environment."  Doc. 9 at 348; 17-2 ¶ 4.  Accordingly, drawing all inferences in Maxwell's favor, the Court presumes Epps's and Hester's misconduct was sufficiently similar to Maxwell's.

'similarly situated,' the different application of workplace rules does not constitute illegal discrimination."); *see also Holifield*, 115 F.3d at 1562 (stating that summary judgment is appropriate if a plaintiff fails to establish a similarly situated employee, and there is no other evidence of discrimination).

### b. Legitimate Non-Discriminatory Reasons/Pretext

Further, the Postal Service has proffered legitimate non-discriminatory reasons for Maxwell's termination, reasons which Maxwell has not disputed as pretext for discrimination.

To satisfy its burden of production, in response to a plaintiff's prima facie case, an employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (quotation marks and citation omitted). The proffered reason must be one that "might motivate a reasonable employer." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Because "this burden involves no credibility determination, it has been characterized as 'exceedingly light.'" *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769–70 (11th Cir. 2005) (citations omitted).

A plaintiff may dispute a defendant's legitimate, non-discriminatory reasons as pretext "by showing that she has been the victim of intentional discrimination . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chapman*, 229 F.3d at 1052 (quoting *Burdine*, 450 U.S. at 256). Put another way, "[a] plaintiff may . . . survive summary judgment by 'presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's

legitimate, non-discriminatory reasons.'" *Freeman v. Perdue Farms Inc.*, 496 F. App'x. 920, 925 (11th Cir. 2012) (quoting *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 965 (11th Cir. 1997)). If a proffered reason is one that would motivate a reasonable employer, to prove it unworthy of credence, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. Thus, the Court must determine "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (citation and quotation marks omitted).[9]

---

[9] There is some confusion regarding a plaintiff's burden to prove pretext. Based on *St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993), some cases suggest that a plaintiff responding to an employer's motion for summary judgment must prove that the employer's legitimate, nondiscriminatory reason is false *and* that discrimination was the real reason for the employer's action. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 587 (6th Cir. 2009); *Maxfield v. Cintas Corp. No. 2,* 427 F.3d 544, 550-51 (8th Cir. 2005). However, the Supreme Court in *St. Mary's* did not address a plaintiff's burden at the summary judgment stage. Rather, the Court addressed whether an employee is entitled to judgment as a matter of law when the factfinder has concluded that the employer's nondiscriminatory reason is false, but nevertheless found that the employer did not intentionally discriminate against the plaintiff. Moreover, as noted by Judge Wilson in his concurring opinion in *Conroy v. Abraham Chevrolet-Tampa, Inc.,* 375 F.3d 1228, 1236 (11th Cir. 2004), the Supreme Court in *St. Mary's* "flatly rejected the so-called 'pretext-plus' approach to discrimination analysis, which had required the plaintiff not only to demonstrate that the employer's asserted reasons were pretextual, but also to introduce additional evidence of discrimination." In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), the Supreme Court disposed of any lingering viability of pretext-plus analysis, stating that while it is true the plaintiff must ultimately prove intentional discrimination, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147 (emphasis in original). In a concurring opinion, Justice Ginsburg, in a summary of the majority's holding, wrote that a plaintiff "*may* survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a 'prima facie case,' . . . ; and second, evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false." *Id.* at 154 (emphasis in original); *see also Dulin v. Bd. of Com'rs of Greenwood Leflore Hosp.*, 657 F.3d 251 (5th Cir. 2011). Clearly, at the summary judgment stage, the plaintiff, in rebutting the employer's proffered legitimate, nondiscriminatory reason, does not shoulder the burden of producing evidence both of falsity and that the real reason was discrimination. Indeed, the *McDonnell Douglas* test is all about proving intentional discrimination by circumstantial evidence; if the employee had direct evidence that the real reason for the adverse employment action was discrimination, the employee would have no need to resort to the *McDonnell Douglas* test.

As stated, Maxwell was a probationary, temporary employee whose position was dependent on satisfactory performance. Doc. 9 at 355. When she was hired, Maxwell acknowledged her probationary status and that satisfactory performance included "maintaining positive working relationships with others; working harmoniously with others in getting the work done; cooperating well with co-workers, supervisors, and others with whom she comes into contact; conducting herself in a manner appropriate to the work setting; and demonstrating a positive approach toward work, co-workers, and supervisors." *Id*. The Postal Service asserts that the April 25 incident, which included an altercation between Maxwell and Epps that required them to be "physically separated," alone constituted a failure to meet the conditions of Maxwell's probationary employment and was cited as such when Maxwell was fired. Doc. 9 at 348. Moreover, the May 6, 2015 request for termination stated that Maxwell's "behavior during mediation was unprofessional and unacceptable" and that she was "unable to control her emotions and also pose[d] a threat to authority." Doc. 9 at 347. These are reasons that would motivate a reasonable employer and, thus, Maxwell must rebut them head on. *Chapman*, 229 F.3d at 1030.

In her response, Maxwell summarily states that "[t]he Defendant's actions were not based on legitimate, non-discriminatory reasons" but "were a pretext for unlawful discrimination." Doc. 22 at 11. Yet, in her deposition, Maxwell admitted that "getting along with others [was a] part of [her] job." Doc. 19 at 79:19-22. Maxwell does not dispute her confrontations with co-coworkers, but she questions why she was the only person fired from the incident if in fact getting along with co-workers is an important part of job. *Id*. at 91:5-25. However, as stated, those other employees, who were disciplined, were not at all similarly situated, and this response does not meet the Postal Service's asserted reason head on and rebut it. Nor has Maxwell shown that her employer was more likely motivated

by a discriminatory reason. *See Chapman*, 229 F.3d at 1052. And the record does not show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the Postal Service's rationale for terminating Maxwell's employment. *See Jackson*, 405 F.3d at 1289. Accordingly, there is no genuine dispute that Maxwell has not proven the Postal Service's legitimate non-discriminatory reason to be pretext for discrimination, and, thus, the Postal Service is entitled to judgment as a matter of law.

### 4. Gender-Based Discrimination and Disparate Treatment

Rather than argue Maxwell's gender-based claims fail within the confines of *McDonnell Douglas*, the Postal Service merely argues that Maxwell's claim was "not fairly presented" for review by this Court. Doc. 17-1 7 n.1 (citing *Smith v. Sec., Dept. of Corrections*, 572 F.3d 1327, 1352 (11th Cir. 2009); *United States v. Massey*, 443 F.3d 814, 819 (11th Cir. 2006) (stating that an issue may be not fairly presented if raised in a way that the district court could not understand it)). The Postal Service correctly states that Maxwell's complaint presents no argument as to how she was discriminated against because of her gender. *Id.* (quoting *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598-99 (11th Cir. 1995) ("the onus is one the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned").

However, in her deposition testimony, Maxwell clarifies that her claim hinges on her assertion that she was not given sufficient work restrictions for her pregnancy.[10] Doc. 19 at 89: 2-25. But like her race-based claims, Maxwell fails to carry her initial burden under *McDonnell Douglas* to establish a prima facie case. To prove gender discrimination, a plaintiff must establish: (1) she is a member of a protected class; (2) she suffered an

---

[10] Maxwell does not allege an ADA failure to accommodate claim based on this assertion.

-15-

adverse employment action; (3) her employer treated similarly situated employees who are not members of the protected class more favorably or replaced the plaintiff with someone outside her protected class; and (3) she was qualified for the job she held. *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005); *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 842-43 (11th Cir. 2000).

Presumably, Maxwell attempts to state that the adverse employment action she suffered due to her gender and pregnancy was that she was not given sufficient restrictions. But her basis for this assertion is unclear. She testified that her doctor told her she could not lift up to 15 pounds. Doc. 19 at 89:12-13.[11] And in response, her supervisor with the Postal Service told her "just lift enough that it was not more than 15 pounds but keep working." *Id.* at 89:13-15. However, Maxwell claims this was insufficient because she still had to bend and her doctor "didn't want [her] to bend," though she admits her doctor did not put that accommodation in his recommended restrictions. *Id.* at 89:19-22. Putting aside whether failure to accommodate can be an adverse employment action for Title VII purposes, it is undisputed that the Postal Service accommodated Maxwell's restrictions.

Moreover, she cannot point to a similarly situated individual who was treated more favorably. She does not point to another individual who was given accommodations beyond that recommended by a doctor. She complains that other people had "more restrictions than [her], and [she] was pregnant." Doc. 19 at 90:2-3. Specifically, she complained that one individual was not required to walk "but so far"; however, she

---

[11] In contrast to Maxwell's assertion that she could not lift over 15 pounds, her doctor's note, which was attached to the EEO Investigation Report prepared and submitted by the Postal Service, states that she could not lift more than "5Lbs" and could not stand for longer than 2 hours. Doc. 9 at 328. Regardless, Maxwell does not allege that her supervisors forced her to lift an amount beyond her restrictions but states that her supervisor told her to stay under the prescribed weight, whatever it exactly was. Doc. 19 at 89:14-15. And she does not allege that she was forced to stand for longer than 2 hours.

-16-

admitted that she did not know what accommodations were required under that individual's doctor's restrictions. Doc. 19 at 90:22-91:4. Accordingly, from the undisputed evidence before the Court, Maxwell cannot establish a valid comparator for her gender-discrimination claims.

**C.   Hostile Work Environment Claim**

Maxwell alleges that she suffered a hostile working environment because of racial harassment at the hand of other employees, including Hester, Epps, and her supervisor, Marcus Daniels.[12] *See generally* Doc. 1. "To establish a hostile work environment claim, [a plaintiff] must show: '(1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.'" *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

To prove harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, an employee must prove that she "subjectively perceive[d] the harassment as sufficiently severe and pervasive" and that "this subjective perception [was] objectively reasonable." *Guthrie v. Waffle House, Inc.*, 460 F. App'x. 803, 806 (11th Cir. 2012) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)). Certainly, Maxwell subjectively

---

[12] Although she alleges that she suffered gender discrimination and disparate treatment, Maxwell does not allege that she suffered sexual harassment or a hostile working environment because of her gender. To the extent she intended to do so, she simply presents no evidence to support such a claim.

considered the harassment she suffered to be severe and pervasive. But to determine objective severity, courts look at the totality of the circumstances, including: "'(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" *Alhallaq v. Radha Soami Trading, LLC*, 484 F. App'x. 293, 295 (11th Cir. 2012) (quoting *Miller v Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)); *see also Mendoza*, 195 F.3d at 1246. "Title VII is not a 'general civility code,' and 'simple teasing . . . offhand comments, and isolated incidents (unless extremely serious)' do not constitute a hostile work environment." *Guthrie*, 460 F. App'x. at 806 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)); *see also Davis v. Town of Lake Park*, 245 F.3d 1232, 1242 (11th Cir. 2001). Moreover, "[w]orkplace conduct is viewed cumulatively and in its social context." *Guthrie*, 460 F. App'x. at 806 (citing *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010)).

Here, the harassment lasted a little less than a month, because Maxwell was fired after only a short time on the job, but Maxwell claims that she suffered harassment every day for three weeks after her first day. Doc. 19 at 58:21-25. First, Maxwell testified that, on her second day of employment, Hester told her that she did not "like [her] kind," meaning African-Americans, and stated that "you black people . . . don't want to do your job." *Id.* at 32:9-11, 34:21-35:2. And Maxwell also stated in her complaint that Hester told her, "I am working on how I treat Yall-African Americans [sic]." Doc. 1 at 10. Similarly, Maxwell alleged in her complaint that Epps threatened that she would "get [Maxwell]" and told Maxwell that "We (White People) run this!" *Id.* at 11. And she testified that Daniels, who is also African-American, told her that he did not like "black females, that's why [he

doesn't] deal with [them], that's why [he's] got a Mexican wife"—a comment that Maxwell characterized as a "racial slur" in her complaint. *Id.* at 4; Doc. 19 at 95:4-7. However, other than this characterization, Maxwell does not allege that anyone used racial epithets or vulgar language towards her. *Cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (the defendant called the plaintiff "boy"); *Miller*, 277 F.3d at 1273-74 (the defendant called the plaintiff ethnic slurs including "Wetback," "Spic," and "Mexican Mother F-----"); *McCann*, 526 F.3d at 1378-79 (the defendant referred to a former African-American employee as a "n---er bitch"). The rest of Maxwell's allegations relate to incidents involving Hester and Epps, in which they "fuss[ed]" and "argued" with her, "exchang[ed] words" with her, or "jump[ed] in [her] face." *See, e.g.*, Doc. 19 at 51:24-53:5. Maxwell did state, in the Postal Service's EEO investigation, that she "was in constant fear for the life of my child and myself" because of Hester and Epps's harassment. Doc. 9 at 123. And Maxwell describes one incident in which Hester "slammed every locker door behind [her]" in an "aggressive, physical" manner, though Maxwell does not allege Hester actually touched her during that incident. Doc. 19 at 45:4-15. But besides this incident and the altercation on April 25, the harassment does not appear to have been physically threatening.

And from the record, the totality of the circumstances does not show a "workplace [that was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Miller*, 277 F.2d at 1275-76 (citations and quotation marks omitted) (stating a jury could find plaintiff established hostile work environment claim where his supervisor "hurled" ethnic slurs at him "three to four times a day"); *see also Alhallaq*, 484 F. App'x at 296 (stating that "offensive conduct," even if "rude and insensitive, is not actionable under Title VII," which does not regulate "offensive utterances

and general vulgarity"). And thus, the harassment Maxwell suffered was, objectively, not sufficiently severe and pervasive.

Accordingly, there is no genuine dispute that Maxwell has failed to state a prima facie claim for hostile work environment. Thus, the Postal Service is entitled to judgment as a matter of law.[13]

### III. CONCLUSION

The Postal Service's motion for summary judgment (Doc. 17) is **GRANTED**. Therefore, Maxwell's claims are **DISMISSED with prejudice**.

**SO ORDERED**, this 3rd day of May, 2018.

> S/ Marc T. Treadwell
> MARC T. TREADWELL, JUDGE
> UNITED STATES DISTRICT COURT

---

[13] The Court assumes, for purposes of the Postal Service's motion, that the alleged harassment was racially motivated. But there is evidence that Hester treated white co-workers poorly as well: Maxwell stated that Hester treated white employees poorly, including calling one "white trash," and Tim Goodwin allegedly stated "[Hester] treated everyone that way." Docs. 43:22-44:2; 22 at 2. Therefore, the issues between her and Maxwell could simply be viewed as a clash of personalities. And "'[p]ersonal animosity is not the equivalent' of the type of harassment prohibited by Title VII, and the plaintiff cannot turn a 'personal feud' into such a Title VII claim." *Alhallaq*, 484 F. App'x at 295-96 (alteration in original) (quoting *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir.1986)). Similarly, it is not clear there is a basis for holding the Postal Service liable for Hester and Epps's harassment. But given Daniels's comment, the Court assumes Maxwell has met that element of her prima facie case.